IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

02 JAN 15 PM 2:30

WORLDWIDE SECURITY SERVICES, LTD., an Illinois corporation,

Plaintiff,

vs.

No. CIV-02-0050 JHG/LCS

SANTA FE PROTECTIVE SERVICES, INC., a New Mexico corporation; BUTCH MAKI, individually and JOHN COPE, individually,

Defendants.

**COMPLAINT FOR BREACH OF CONTRACT, UNFAIR COMPETITION, INTERFERENCE WITH CONTRACTUAL RELATIONS, CIVIL CONSPIRACY, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, UNFAIR TRADE PRACTICES, FRAUDULENT MISREPRESENTATION, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AND PRIMA FACIE TORT**

For its complaint, Plaintiff Worldwide Security Services, Ltd., by and through its attorneys, Rodey, Dickason, Sloan, Akin & Robb, P.A. (Rex D. Throckmorton and Susan B. Fox) states:

1. This is an action for damages in excess of $75,000.00 resulting from breach of contract, unfair competition, interference with contractual relations, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, unfair trade practices, fraudulent misrepresentation, civil conspiracy and prima facie tort by the Defendant Santa Fe Protective Services, Inc., and for unfair competition, interference with contractual relations, civil conspiracy, fraudulent misrepresentation, aiding and abetting breach of fiduciary duty and prima facie tort by Defendants Maki and Cope.

## PARTIES, JURISDICTION AND VENUE

2. Plaintiff Worldwide Security Services, Ltd. is an Illinois corporation with its principal place of business in Illinois.

3. Defendant Santa Fe Protective Services, Inc. is a New Mexico corporation with its principal place of business in New Mexico.

4. Defendant Butch Maki is a citizen and resident of the State of New Mexico.

5. Defendant John Cope is a citizen and resident of the State of New Mexico.

6. The United States District Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as diversity of citizenship exists and the amount in controversy exceeds $75,000.00. This Court has exclusive jurisdiction over the copyright claim under 28 U.S.C. § 1338.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND

8. Worldwide Security Services, Ltd. ("Worldwide") is a security services company which began doing business in 1992. Since that time, Worldwide has provided data, personnel, corporate and governmental security services throughout the United States. Worldwide is qualified to do business in New Mexico.

9. Defendant Maki is a political consultant. In 1999, he was retained by Worldwide to notify Worldwide of potential business opportunities of which he became aware. He was retained in this capacity by Worldwide until January 2001.

10. In November 1999, Defendant Maki notified Worldwide of a potential business opportunity southwest of Carlsbad, New Mexico. According to Defendant Maki, Westinghouse TRU Solutions, LLC ("Westinghouse"), which held the prime government managing and operating

contract for the United States Department of Energy ("DOE") on the federal Waste Isolation Pilot Project ("WIPP"), was seeking a security subcontractor for the WIPP site. However, said Maki, Westinghouse was seeking to fill the subcontract with a Hispanic, woman-owned, New Mexico-based security company with a small business designation. Maki suggested to Worldwide that Maki would establish such a security company to bid for the subcontract with Westinghouse. Maki and Worldwide agreed that Worldwide would enter into a joint venture with Maki's prospective company under a "mentoring" arrangement to provide services, technical and financial support to Maki's prospective company. The "mentoring" arrangement is an arrangement recognized and sanctioned by the United States government, whereby small businesses, which otherwise might not be able to effectively compete for governmental contracts, may partner with a larger established "mentor" company in a joint venture to obtain and service a government contract.

11. Upon information and belief, Defendant Maki established a minority-owned small business called Santa Fe Protective Services, Inc. ("SFPS") on November 23, 1999. Christina Moya, Maki's daughter, held the title of CEO of SFPS at that time.

12. In December 1999, Defendant Maki approached Tony Shepherd, then-President and CEO of Worldwide, and indicated that he and Defendant John Cope were interested in purchasing Worldwide. During the ensuing negotiations, Defendants Maki and Cope requested and received the opportunity to thoroughly examine all aspects of Worldwide's business, including Worldwide's financial records. On January 3, 2000, Defendants Maki and Cope each entered into a contract with Worldwide agreeing, inter alia, that proprietary information received during the purchase negotiations would be kept confidential and would not be used for any purpose other than in connection with the proposed transaction, and that, for a period of two years from the date of the

agreement, they would neither directly nor indirectly solicit or hire any Worldwide employee. Acquisition negotiations ceased on or about August 2000 and the proposed transaction was never consummated.

13. In a meeting with Maki on or about August 16, 2000, Worldwide representative Robert Coe and SFPS representatives Christina Moya and Robert Ficinus agreed that Worldwide would team with SFPS to seek the Westinghouse WIPP security subcontract (the "Agreed Arrangement"). Under the Agreed Arrangement, if the Worldwide/SFPS team was awarded the subcontract, Worldwide would act as mentoring company and provide management guidance, oversight and other services to the SFPS management team throughout the security subcontract period. Under the Agreed Arrangement, Worldwide would act as SFPS' mentoring subcontractor and would provide services and a number of employees equaling 45 percent of the value of the Westinghouse WIPP security subcontract, and SFPS would provide the remainder of the services and employees under the Westinghouse WIPP security subcontract amounting to 55 percent of the value of the subcontract. Further, under the Agreed Arrangement, Worldwide would provide all start-up support activities to SFPS. For a separate additional fee to SFPS of one-quarter of the cost of a Full Time Equivalent ("FTE"), Worldwide would provide continuing administrative support services to the subcontract, such as payroll, financial accounting, human resources and benefits. While the goal was for SFPS to be administratively self-sufficient by the end of the first subcontract year, the joint venture was to last for the 5-year duration of the WIPP security subcontract period, including the 45-55 percentage split arrangement. This oral agreement was to be reduced to writing in a "Teaming Agreement" at such time as the security subcontract was awarded to the SFPS-

Worldwide team. Despite numerous requests from Worldwide, SFPS refused to finalize a Teaming Agreement with Worldwide until the Westinghouse WIPP security subcontract had been finalized.

14. On or about August 17, 2000, Worldwide Vice-President Robert Coe attended a meeting in Albuquerque, New Mexico with Westinghouse representatives for purposes of presenting the SFPS-Worldwide team's interest and capabilities with regard to the WIPP security subcontract. Defendant Maki, SFPS President Robert Ficinus and SFPS CEO Christina Moya also attended the meeting on behalf of the SFPS-Worldwide team and made brief presentations. During that meeting, Robert Coe made an in-depth presentation of Worldwide's security and governmental contract experience and capabilities, and Robert Ficinus described the proposed mentoring arrangement between Worldwide and SFPS.

15. As a result of the August 17, 2000 meeting with Westinghouse, the SFPS-Worldwide team was selected by Westinghouse to submit a cost proposal for inclusion in Westinghouse's proposal to the DOE for the WIPP security subcontract.

16. Worldwide provided to SFPS all of the agreed-upon services preliminary to obtaining and commencing performance of the Westinghouse WIPP security subcontract, including cost accounting and cost proposal work. Worldwide drafted and prepared the security subcontract bid and proposal documents. When the cost proposal calculations were actually performed, it was determined that the most suitable operational division of security employees between Worldwide and SFPS would result in a 43-57 percent split of the value of the Westinghouse WIPP security subcontract instead of a 45-55 percent split, and this modification of the Agreed Arrangement was accepted by both Worldwide and SFPS. All other terms of the Agreed Arrangement remained the same.

17. Worldwide prepared the SFPS bid proposal on the WIPP security subcontract on SFPS' behalf and submitted it to Westinghouse on January 16, 2001 for inclusion in the prime bid to the Department of Energy. Security Subcontract Bid and Proposal to Washington Group International, Response to Westinghouse Waste Isolation Pilot Plan (WIPP) RFP 104519 Protective Force Services, Exhibit A. That bid and proposal described Worldwide's security and government contract experience and history, the expertise and resources of Worldwide, and Worldwide's financial strengths and history. The bid and proposal were based entirely upon Worldwide's strength as an established security company. The bid and proposal, which was signed by SFPS' then-President Robert Ficinus, represented that Worldwide would provide its expertise and the security capability necessary to ensure proper performance of all aspects of the WIPP security proposal. The qualification criteria submitted with the bid and proposal further represented that Worldwide's corporate assets would be available at all times. The bid and proposal included financial cost proposals and projections prepared by Worldwide on behalf of the SFPS-Worldwide team which reflected a 43-57 percentage split arrangement throughout each of the five years of the subcontract period.

18. Based upon the bid and proposal prepared by Worldwide and signed by SFPS, an interim subcontract ("Interim Contract") for security on the WIPP site was awarded to SFPS on May 23, 2001. That subcontract was premised upon and required the Worldwide mentor relationship as part of its terms. Interim Contract (Purchase Order PO104519) and February 12, 2001 Statement of Work, Exhibit B.

19. The SFPS-Worldwide team began providing security services on the WIPP site under the Interim Contract on February 1, 2001. Between that date and August 2001, Worldwide

performed the security services set forth in the bid and proposal and the interim contract, and provided mentoring and other services to SFPS under the Agreed Arrangement.

20. In February and March of 2001, the Department of Energy conducted an audit of the Westinghouse security subcontract in response to unofficial complaints to DOE headquarters. As part of that audit, Worldwide was required to and did assure the DOE that it would continue to provide security services and financial support on the WIPP security subcontract. Letter "To Whom It May Concern," from Robert L. Coe, President, Worldwide Security Services, Ltd., dated April 17, 2001, Exhibit C.

21. In March 2001, Defendant Maki and SFPS hired Worldwide President and CEO Tony Shepherd away from Worldwide to be Vice-President of SFPS and to oversee all security and marketing operations. SFPS also hired Terry Cuba away from his position as Vice-President of Security Operations at Worldwide to be SFPS' WIPP site General Manager.

22. The Westinghouse WIPP security subcontract between SFPS and Westinghouse was finalized in August 2001 ("Final Contract"). Upon information and belief, the Final Contract also contemplated the SFPS-Worldwide mentor arrangement as part of its terms.

23. Without the mentoring arrangement between Worldwide and SFPS, Worldwide's commitments and reassurances to the DOE and Westinghouse, and the experience, reputation and assistance of Worldwide, SFPS would not have qualified for the award of the WIPP security subcontract, nor would it have retained the WIPP security subcontract after the post-award DOE audit.

24. Between August 2001 and December 1, 2001, Worldwide performed the security services set forth in the bid and proposal and the Final Contract, and provided mentoring and other services to SFPS contemplated by the Agreed Arrangement.

25. After the Westinghouse contract was finalized, Worldwide again sought to finalize and execute a Teaming Agreement with SFPS. Robert Coe, on behalf of Worldwide, and Tony Shepherd, on behalf of SFPS, agreed upon a final draft Teaming Agreement on or about October 2001. Upon information and belief, SFPS refused to execute any Teaming Agreement upon the advice of Defendants Maki and/or Cope.

26. On November 30, 2001, Robert Coe received notice from Worldwide's employees at the WIPP site that they had been told by SFPS' representative and general manager Terry Cuba that SFPS was terminating Worldwide's involvement in the WIPP project effective December 1, 2001. That same day, Worldwide received written notice from SFPS' attorney that Worldwide's security services were being terminated and that Worldwide's services would no longer be accepted at the WIPP site.

27. Since December 1, 2001, SFPS has refused to allow Worldwide to perform any services pursuant to the Westinghouse security subcontract for the WIPP site, has refused to pay present and future amounts due to Worldwide under the 43-57 percentage arrangement, and has repudiated the Agreed Arrangement.

28. Up to December 1, 2001, when SFPS repudiated the Agreed Arrangement and refused to allow Worldwide to perform any services pursuant to the Westinghouse WIPP security subcontract, Worldwide has remained available to provide, and has provided, such levels of support

required to ensure the success of the Westinghouse WIPP security subcontract, and continued to act as mentoring company to SFPS in all necessary capacities.

29. On December 3, 2001, SFPS hired eleven of the twelve on-site Worldwide employees to perform security services on the WIPP site for SFPS.

30. As a result of SFPS' actions, Worldwide has lost future profits under the Westinghouse WIPP security subcontract and under the Agreed Arrangement.

**COUNT I**

**BREACH OF CONTRACT**

31. Plaintiff refers to paragraphs 1 through 30 above, and incorporates said paragraphs by reference as though set out in full herein.

32. An oral contract existed between Worldwide and SFPS. That contract required that both parties would perform under the Westinghouse WIPP security subcontract for the 5-year duration of the subcontract and that the revenues therefrom would be split 43 percent to Worldwide and 57 percent to SFPS.

33. Defendant SFPS breached the oral agreement between Worldwide and SFPS by repudiating the agreement, unilaterally stopping work on the WIPP security subcontract by Worldwide on December 1, 2001 and by refusing to pay Worldwide sums under the contract to which Worldwide is entitled.

34. Upon information and belief, Defendant SFPS breached the contract willfully and wantonly.

35. As the result of SFPS' breach, Worldwide was damaged.

## COUNT II

## UNFAIR COMPETITION

36. Plaintiff refers to paragraphs 1 through 35 above, and incorporates said paragraphs by reference as though set out in full herein.

37. Defendants SFPS, Maki and Cope established the SFPS corporation as an inexperienced, minority-owned security company headed by Moya, induced Worldwide to allow Maki and Cope to examine its proprietary information under the guise of due diligence pursuant to a purchase offer, induced Worldwide to agree to act as mentor company to SFPS in order that SFPS might reap the benefits from that arrangement, and lured key Worldwide employees away from Worldwide and to SFPS so as to place SFPS in a position to repudiate its agreement with Worldwide, to receive 100 percent of the value of the Westinghouse WIPP security subcontract, and to obtain governmental contracts currently held by Worldwide.

38. Worldwide has been damaged by the Defendants' conduct.

## COUNT III

## INTERFERENCE WITH CONTRACTUAL RELATIONS

39. Plaintiff refers to paragraphs 1 through 38 above, and incorporates said paragraphs by reference as though set out in full herein.

40. A valid, enforceable contract existed between SFPS and Worldwide.

41. Defendants Maki and Cope each had knowledge of the contractual relationship between SFPS and Worldwide.

42. Defendants Maki and Cope each played active and substantial roles in causing Worldwide to lose the benefits of the Westinghouse WIPP security subcontract and each

intentionally and improperly interfered with the contractual relationship between SFPS and Worldwide with an improper motive, to harm Worldwide, or by improper and unlawful means, without justification or privilege.

43. Worldwide suffered pecuniary harm as a result of Maki's and Cope's interferences, in an amount to be proven at trial.

**COUNT IV**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

44. Plaintiff refers to paragraphs 1 through 43 above, and incorporates said paragraphs by reference as though set out in full herein.

45. There is an implied covenant to act in good faith and to deal fairly in connection with SFPS' duties and obligations under the Agreed Arrangement and pursuant to the Westinghouse WIPP security subcontract.

46. SFPS breached the implied covenant of good faith and fair dealing when, in bad faith, or wrongfully and intentionally, it used the Agreed Arrangement and the Westinghouse WIPP security subcontract to the detriment of Worldwide.

47. SFPS' conduct denied Worldwide its rights to the benefit of the Agreement Arrangement and the WIPP security subcontract.

48. Upon information and belief, the breach of the implied covenant of good faith and fair dealing by SFPS was willful, wanton, malicious and done with reckless disregard for the rights of Worldwide and the resulting harm.

## COUNT V

## BREACH OF FIDUCIARY DUTY

49. Plaintiff refers to paragraphs 1 through 48 above, and incorporates said paragraphs by reference as though set out in full herein.

50. As a joint venturer with Worldwide, SFPS assumed a position of trust and confidence with respect to Worldwide, and undertook to act for the benefit of its co-joint venturer.

51. Worldwide relied upon SFPS to act for the mutual benefit of the joint venture.

52. SFPS breached its duties to Worldwide and the joint venture by placing its own interests above those of Worldwide and the joint venture.

53. Worldwide sustained harm caused by SFPS' breach of its duties.

54. Upon information and belief, the breach of fiduciary duty by SFPS was willful, wanton, malicious and done with reckless disregard.

## COUNT VI

## UNFAIR TRADE PRACTICES

55. Plaintiff refers to paragraphs 1 through 54 above, and incorporates said paragraphs by reference as though set out in full herein.

56. Worldwide was induced to sell its services to SFPS, which, in turn, sold services under the Westinghouse WIPP security subcontract. In connection with the sale of these services, SFPS committed unfair trade practices by misrepresenting that Worldwide would receive 43 percent of the value of the WIPP security subcontract for the 5-year duration of the subcontract, and by failing to tell Worldwide that SFPS was using Worldwide only to obtain the Westinghouse WIPP

security subcontract and that it would hire away Worldwide's key employees and breach its agreement with Worldwide.

57. SFPS' willful actions violated the New Mexico Unfair Practices Act, NMSA 1978, § 57-12-1 et seq., and constituted unfair or deceptive trade practices, by knowingly making false or misleading representations in connection with the sale of security services pursuant to the Westinghouse WIPP security subcontract in the regular course of SFPS' business, which representations tended to and did deceive or mislead Worldwide as well as third parties.

58. SFPS' willful actions in connection with the offer and sale of security services pursuant to the Westinghouse WIPP security subcontract constituted "unconscionable trade practices" under NMSA 1978, § 57-12-2(E), which resulted in a gross disparity between the costs extracted from Worldwide for its participation in the "mentor" arrangement with SFPS, and the value received by Worldwide from that arrangement.

59. SFPS violated the New Mexico Unfair Practices Act to Worldwide's detriment.

**COUNT VII**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

60. Plaintiff refers to paragraphs 1 through 59 above, and incorporates said paragraphs by reference as though set out in full herein.

61. Defendants Maki and Cope knew of SFPS' fiduciary duty to Worldwide.

62. Defendants Maki and Cope intentionally provided substantial assistance or encouragement to SFPS to breach its contract with Worldwide, which Maki and Cope knew to be a breach of SFPS' duty.

63. Worldwide was damaged by Maki and Cope's actions.

64. Defendants Maki and Cope's actions were willful, malicious and done with reckless disregard.

**COUNT VIII**

**FRAUDULENT MISREPRESENTATION**

65. Plaintiff refers to paragraphs 1 through 64 above, and incorporates said paragraphs by reference as though set out in full herein.

66. Defendants represented to Worldwide that Worldwide would receive 43 percent of the value of the WIPP security subcontract for the five-year duration of the subcontract, and represented that the mentoring arrangement between SFPS and Worldwide would be mutually beneficial and would continue throughout the duration of the Westinghouse WIPP security subcontract, which statements were untrue.

67. At the time Defendants made the representations as to the percentage split and the mentoring arrangement, Defendants knew that SFPS would not honor the percentage split and the mentoring arrangement for the duration of the Westinghouse WIPP security subcontract, and that their real purpose in entering into the mentoring arrangement was to place SFPS in a position to repudiate its agreement with Worldwide, obtain 100 percent of the value of the Westinghouse WIPP security subcontract and to obtain governmental contracts currently held by Worldwide.

68. Defendants' representations were made with the intent to deceive and to induce Worldwide to rely upon the representations and enter into the mentoring arrangement.

69. Worldwide relied on Defendants' representations.

70. As a result of Defendants' actions, Worldwide was damaged.

71. Defendants' actions were willful, wanton, malicious and done with reckless disregard.

## COUNT IX

## CIVIL CONSPIRACY

72. Plaintiff refers to paragraphs 1 through 71 above, and incorporates said paragraphs by reference as though set out in full herein.

73. The Defendants conspired to cause SFPS to breach its contract with Worldwide, to breach its fiduciary duty to Worldwide, to commit fraud and to breach its implied covenant of good faith and fair dealing with Worldwide.

74. Pursuant to the conspiracy, the Defendants established the SFPS corporation as an inexperienced, minority-owned security company headed by Moya, induced Worldwide to allow Maki and Cope to examine its proprietary information under the guise of due diligence pursuant to a purchase offer, induced Worldwide to agree to act as mentor company to SFPS in order that SFPS might reap the benefits from that arrangement, and lured key Worldwide employees away from Worldwide and to SFPS so as to place SFPS in a position to repudiate its agreement with Worldwide, to receive 100 percent of the value of the Westinghouse WIPP security subcontract, and to obtain governmental contracts currently held by Worldwide.

75. The Defendants conspired to commit acts giving rise to the causes of action stated herein.

76. Worldwide was damaged as a result of the Defendants' actions.

## COUNT X

## PRIMA FACIE TORT

77. Plaintiff refers to paragraphs 1 through 76 above, and incorporates said paragraphs by reference as though set out in full herein.

78. The Defendants intentionally acted to establish a competing security business, gain access to Worldwide's proprietary business information, to cause Worldwide to enter into a mentor arrangement with SFPS in order to obtain a lucrative government contract, to cause Worldwide's key personnel to defect to SFPS, to cause SFPS to repudiate its agreement with Worldwide and to cause Worldwide to lose the benefit of the Westinghouse WIPP security subcontract.

79. The Defendants acted with intent to harm Worldwide, and/or knew their conduct was substantially certain to result in harm to Worldwide.

80. Worldwide was injured as a result of Defendants' intentional acts.

81. The Defendants' actions were performed in the absence of justification under the circumstances and, upon information and belief, were willful, wanton and malicious, meriting punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Worldwide Security Services, Ltd. moves the Court for a judgment and order in the following particulars:

a. an award of compensatory damages of not less than $75,000.00, together with interest and costs, and incidental and consequential damages, in an amount to be proven at trial;

b. an award of punitive, exemplary and/or statutory treble damages;

c. pre- and post-judgment interest;

d. an award of costs, litigation expenses and attorneys' fees; and

e. any and further relief that the Court deems just and proper.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By_______________________________
Rex D. Throckmorton
Susan B. Fox
Attorneys for Plaintiff Worldwide Security Services, Ltd.
Post Office Box 1888
Albuquerque, New Mexico 87103
Telephone: (505) 765-5900

THE EXHIBITS ATTACHED TO THIS PLEADING ARE TOO VOLUMINOUS TO SCAN. SAID EXHIBITS ARE ATTACHED TO THE ORIGINAL PLEADING IN THE CASE FILE WHICH IS LOCATED IN THE RECORDS DEPARTMENT, U.S. DISTRICT COURT CLERK'S OFFICE..